**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS E. HEFFRON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-996 |
| | ) | |
| GREEN TREE SERVICING, LLC, | ) | |
| a Delaware Limited Liability Company, | ) | Jury Trial Demanded |
| | ) | |
| *Defendant*. | ) | |

**COMPLAINT FOR RELIEF**

NOW COMES the Plaintiff, THOMAS E. HEFFRON ("Mr. Heffron"), by and through

his attorneys, Zamparo Law Group, P.C., and complaining of the Defendant, GREEN TREE

SERVICING, LLC ("Green Tree"), alleges as follows:

**NATURE OF THE ACTION**

1.      Green Tree engaged in repeated and continuous communications (including

telephone calls) in an attempt to collect an amount of money not owed.  Green Tree made

repeated and continuous telephone calls daily, beginning around April 2013 and continuing to

around May 2014, with sometimes around eight (8) to ten (10) calls per day (every day of the

week, including weekends, and even on holidays), to demand payment, despite being told (on

more than 10 occasions), the amounts were already paid, not owed, and thus Mr. Heffron refused

to pay.  On dozens of occasions Green Tree hung up the phone without leaving a message,

intentionally vexing and harassing Mr. Heffron.  Green Tree attempted to collect amounts not

owed, and made false deceptive and misleading statements about the amount, nature and

character of the debt.  Green Tree's harassment drove Mr. Heffron to such depths of despair that

he attempted to take his own life.

2.    Upon information and belief, Green Tree applied most, if not all, of the money it received from Mr. Heffron each month to improperly assessed escrow account deficiencies, despite the fact that Mr. Heffron continued to pay his property taxes and homeowners' insurance himself.  Then Green Tree sought to collect amounts from Mr. Heffron that were not due.

3.    Green Tree's unlawful conduct caused Mr. Heffron severe emotional and physical injury including anxiety, depression, fear, lack of concentration, chest pains, headaches, acute renal kidney failure, swollen hands and feet, as well as hospitalization and ongoing medical treatment.

4.    Green Tree has a history and business plan of collection harassment and telephone abuse.  See: *Messina v. Green Tree Servicing, LLC*, 14-cv-07099 (N.D. IL 2014); *Modica v. Green Tree Servicing, LLC*, 14-cv-03308 (N.D. IL 2014)*, Green Tree Servicing, LLC v. Respert*, 14-CV-193 (M.D. GA 2014), *Castro v. Greentree Servicing, LLC*, 10-GV-7211 (S.D. NY 2010), *Massey v. Green Tree Servicing, LLC*, 09-cv-01117 (W.D. WV 2009), *Obarr v. Green Tree Servicing, LLC*, 09-cv-09496 (C.D. CA 2009), and many others.

5.    According to 15 U.S.C. §1692:

There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to **invasions of individual privacy.**

6.    Green Tree violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq*. ("FDCPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a ("ICFA"), and related common law.

## JURISDICTION AND VENUE

7.    This action arises under, and is brought pursuant to the FDCPA, ICFA, and Illinois common law.  Subject matter jurisdiction is conferred upon this Court by 15 U.S.C.

§1692 (FDCPA), and 28 U.S.C. §§1331, 1337, as the actions arise under the laws of the United States.  Supplemental jurisdiction exists for state law claims pursuant to 28 U.S.C. §1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, as Green Tree does business in this District and Green Tree's collection communications and practices were directed to Mr. Heffron within this District.

## PARTIES

9.      Mr. Heffron is natural person who resides in Wood Dale, Illinois.

10.     At all times relevant to the action, Green Tree was a Delaware limited liability company with its principal office located at 345 St. Peter Street, Suite 300, St. Paul, Minnesota.

11.     Green Tree does or transacts business in Illinois.

12.     Green Tree's registered agent in Illinois is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois.

## FACTS SUPPORTING ALL CLAIMS FOR RELIEF

*Background Information on Mr. Heffron's Mortgage*

13.     Mr. Heffron has been living in his home at 145 Elmwood Avenue, Wood Dale, Illinois since he bought it the day after his twenty-first birthday about 40 years ago.

14.     On or about May 8, 2007, Mr. Heffron granted a first and second mortgage to GMAC Mortgage Corporation ("GMAC Mortgage") on his primary residence at 145 North Elmwood Avenue in Wood Dale, Illinois ("the Property").  These mortgages secured the extension of credit for personal and household use.

15.     On or about July 12, 2011, Mr. Heffron filed a voluntary petition for protection under the United States Bankruptcy Code.  In his petition, Mr. Heffron sought to discharge his

person liability under the first and second mortgages granted to GMAC Mortgage; neither obligation was reaffirmed.

16.     On or about October 18, 2011, Mr. Heffron was granted a discharge of his debts pursuant to Chapter 7 of the Bankruptcy Code.

17.     On or about March 13, 2012, GMAC Mortgage initiated a foreclosure proceeding in DuPage County to foreclose on its lien against the Property.

*GMAC Modifies Mr. Heffron's Mortgage*

18.     In the summer of 2012, Mr. Heffron sought a modification of the terms of the first mortgage against the Property with the assistance of a law firm in Florida ("the Florida law firm").

19.     On or about September 11, 2012, GMAC Mortgage sent Mr. Heffron, care of the Florida law firm, a Non-HAMP Loan Modification Agreement ("the GMAC Modification") which explicitly acknowledged Mr. Heffron's bankruptcy discharge and further noted that:

> [Mr. Heffron] understands that [he] is not personally obligated to repay the mortgage loan and that GMAC Mortgage. LLC is not attempting to collect any debt from [him]. Signing this Agreement will not make [Mr. Heffron] personally liable for the mortgage loan. [Mr. Heffron] understands that GMAC Mortgage, LLC will continue to retain its lien on the Property, along with all rights to enforce such lien against the Property. Whether [Mr. Heffron] chooses to make voluntary payments in the amount of the original monthly payment as set forth in the Note *or the modified monthly payments as set forth in this Agreement*, such payments will reduce the amount of the lien.

(emphasis added) Non-HAMP Loan Modification Agreement attached hereto and made a part hereof as Exhibit A.

20.     Elsewhere, the GMAC Modification explained Mr. Heffron's responsibilities with respect to payment:

> [Mr. Heffron] promises to make monthly principal and interest payments of $484.47, beginning on October 1, 2012, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on

September 1, 2052 (the "Maturity Date"), amounts remain due under the Note and Security Instrument, as amended by this Agreement, [Mr. Heffron] will pay these amounts in full on the Maturity Date. . . . The amounts indicated in this paragraph do not include any required escrow payments for items such as hazard insurance or property taxes; *if such escrow payments are required* the monthly payments will be higher and may change as the amounts required for escrow items change.

Exhibit A at ¶ 3 (emphasis added).

21.     The GMAC Modification was silent as to the amount of any escrow payments Mr. Heffron might be required to pay, but the Cover Letter that accompanied the modification clearly explained that Mr. Heffron's total monthly payment would not require escrow payments, stating:

**Modified Payment Amount**

| | |
|---|---|
| Principal and Interest | $484.47 |
| Escrow | $0.00 |
| **Total Payment** | **$484.47** |

GMAC Modification Cover Letter ("Cover Letter") attached hereto and made a part hereof as Exhibit B.

22.     On information and belief, GMAC Mortgage never sent Mr. Heffron an initial escrow account statement as required by 12 U.S.C. §2609(c)(1)(A) or any annual escrow account statements as required by 12 U.S.C. §2609(c)(2)(A) after sending him the Modification Agreement and Cover Letter.

23.     The Cover Letter also stated that "[Mr. Heffron's mortgage] account will be brought current with the first modified payment beginning October 1, 2012."  Exhibit B.

24.     Based upon the foregoing, Mr. Heffron believed that he would be in compliance with the terms of the GMAC Modification if he paid $484.47 to GMAC Mortgage each month. On or about September 19, 2012, Mr. Heffron signed the GMAC Modification and GMAC Mortgage later had it recorded with the DuPage County Recorder of Deeds.

25.     On or about October 15, 2012, GMAC Mortgage dismissed the foreclosure action against Mr. Heffron.

26.     After signing the GMAC Modification, Mr. Heffron made his mortgage payments to GMAC as called for by the GMAC Modification.

27.     After signing the GMAC Modification, Mr. Heffron paid his property taxes to the DuPage County Treasurer and maintained a fully-paid hazard insurance policy on the Property. At no time after signing the GMAC Modification was Mr. Heffron delinquent in the payment of either of these obligations.

*GMAC Transfers the Servicing of Mr. Heffron's Mortgage to Green Tree*

28.     Effective February 1, 2013, GMAC Mortgage transferred its rights to service Mr. Heffron's recently modified first mortgage to Green Tree.

29.     For reasons unknown, GMAC Mortgage sent its notice of this servicing transfer to Mr. Heffron care of the Florida law firm on or about January 23, 2013.

30.     Mr. Heffron was unaware that GMAC Mortgage had sent correspondence relating to his first mortgage to the Florida law firm after it had ceased representing him.

31.     At the same time, GMAC Mortgage continued to send correspondence concerning the second mortgage directly to Mr. Heffron.

32.     On or about February 6, 2013, before Mr. Heffron had any knowledge of the transfer, GMAC Mortgage sent Mr. Heffron a letter stating that the servicing of his second mortgage would be transferred to Ocwen Home Loan Servicing, LLC ("Ocwen").

33.     The February 6, 2013 letter led Mr. Heffron to believe that he should direct his payments of $484.47, called for by the GMAC Modification, to Ocwen.  Thus, Mr. Heffron timely sent two such payments to Ocwen, on or about March 1, 2013 and on or about March 29, 2013.

34.     On or about April 16, 2013, the Mr. Heffron's former counsel in Florida sent him a package of mail it had received for him dating back to January of 2013, including GMAC Mortgage's notice of servicing transfer to Green Tree and other correspondence from Green Tree.

35.     Upon receipt of the April 16, 2013 package from the Florida law firm (his former counsel), Mr. Heffron contacted Green Tree to request information and to request that all correspondence be forward to him from that point forward.

36.     Mr. Heffron also contacted Ocwen to request that they forward the two payments he had mailed to them in March to Green Tree.

37.     Although Green Tree representatives spoke to Mr. Heffron on the telephone and knew or should have known that he was no longer represented by the Florida law firm, Green Tree did not change the mailing address it had on file for Mr. Heffron for many months.

38.     In fact, from the date it acquired servicing rights to Mr. Heffron's mortgage until approximately the end of August of 2013, Green Tree sent correspondence to Mr. Heffron's former counsel despite his numerous oral and written requests that Green Tree send all correspondence directly to him at the Property.

*Green Tree's Campaign of Telephone Harassment Begins*

39.     After Mr. Heffron contacted Green Tree in mid-April of 2013, Green Tree representatives began to repeatedly and continuously call him daily, sometimes around  every day of the week, including weekends, and even on holidays),  (8) to ten (10) times a day, to demand payment of various amounts in excess of the $484.47 called for by the GMAC Modification.  Chief among these individuals was someone who identified himself as "Jason."

40.     Green Tree representatives would call Mr. Heffron numerous times before and after work, as early as 8:00 a.m. and as late as 9:00 p.m., every day.

41.     Ignoring Mr. Heffron's please that he made all payments due, disputed owing the debt, and thus refused to pay, Green Tree representatives would leave numerous messages on Mr. Heffron's answering machine, during working hours, demanding that he call them back.

42.     On dozens of occasions Green Tree would just call and hang up without leaving a message, with the intent to vex and annoy Mr. Heffron.

43.     Mr. Heffron believed that he was in compliance with the terms of the GMAC Modification, that no escrow items were required pursuant thereto, that he was personally responsible for paying the real estate taxes and homeowner's insurance directly, and that he was current with regard to all of these obligations.

44.     Mr. Heffron also wrote numerous letters that he mailed and faxed to Green Tree explaining their error and demanding that they update their records accordingly.

45.     Nevertheless, Green Tree representatives did not deviate from their relentless campaign of telephone calls demanding that Mr. Heffron pay amounts far beyond those called for in the GMAC Modification and Cover Letter.

46.     Green Tree's communications (including numerous letters and phone calls in 2014) misrepresented the character, amount and legal status of the debt, and attempted to collect an amount of money not owed.  Green Tree sent Mr. Heffron numerous letters in 2014.

*Mr. Heffron Informs Green Tree of Its Erroneous Attempts to Collect from Him*

47.     Mr. Heffron was confused and frustrated by Green Tree representatives' demands that he pay escrow amounts because he had not yet received any statements from Green Tree nor any documentation of the amounts Green Tree representatives were seeking from him.

48.     As of July 25, 2013, Mr. Heffron had still not received any written correspondence or statements from Green Tree at the address of the Property where he lived because Green Tree continued to direct all of its communications to Mr. Heffron's former counsel despite Mr. Heffron's many faxes and letters (that included his mailing address at the Property) requesting information.

49.     Upon information and belief, Green Tree never sent Mr. Heffron any initial escrow account statement as required by 12 U.S.C. §2609(c)(1)(A) or any annual escrow account statements as required by 12 U.S.C. §2609(c)(2)(A).

50.     Mr. Heffron sent Green Tree two more letters, one on August 6, 2013 and another on August 19, 2013. In both, he once again explained his personal responsibility for homeowner's insurance and real estate taxes and requested assistance from Green Tree in resolving the escrow deficiencies improperly assessed against his account.

51.     On or about August 19, 2013, Green Tree sent Mr. Heffron a letter in which it purported to deny his request to cancel his escrow account. Mr. Heffron had never requested such a cancellation, but had merely reiterated his understanding of the GMAC Modification and accompanying Cover Letter, namely that he was not required to pay escrow items and was personally responsible for his real estate taxes and homeowner's insurance.

52.     On or about August 26, 2013, Green Tree sent Mr. Heffron a letter in which it confirmed that "[r]ecords reflect that your monthly payment amount is $484.47, as you referenced; furthermore, we are not collecting any funds to pay your taxes and insurance." Green Tree Letter of August 26, 2013, attached and made a part hereof as Exhibit C.

53.     The August 26, 2013 letter clearly contradicted the messages Mr. Heffron was receiving from Green Tree representatives when they called him, further confusing him.

9

54. Indeed, Green Tree representatives continued to call Mr. Heffron multiple times a day throughout this period demanding payment of amounts in excess of $484.47.

55. Upon information and belief, Green Tree applied most, if not all, of the money it received from Mr. Heffron each month to improperly assessed escrow account deficiencies, despite the fact that Mr. Heffron continued to pay his property taxes and homeowner's insurance himself.

*Green Tree Improperly Pays Mr. Heffron's Taxes and Force-Places Insurance on the Property*

56. On or about May 17, 2013, Mr. Heffron sent a check in the amount of $2,694.78 to the DuPage County Treasurer (the "Treasurer") to cover his *full* 2012 property tax obligation, which was accepted and deposited.

57. Unbeknownst to Mr. Heffron, on or about May 24, 2013, Green Tree submitted a payment in the amount of $1,347.39 to the Treasurer for 2012 property taxes on the Property.

58. For reasons unknown, the Treasurer processed Green Tree's payment before it processed Mr. Heffron's check.

59. On or about June 28, 2013, the Treasurer informed Mr. Heffron by letter that it had received duplicate payments and that he should apply for a refund of the duplicate payment. This was the first time Mr. Heffron became aware that Green Tree had paid any amounts to the Treasurer for his property tax obligations.

60. Upset, Mr. Heffron contacted Green Tree and forwarded it the materials he had received from the Treasurer and directed it to apply for the refund because he had prepaid the entire year's property tax obligation.

61. Green Tree never responded to Mr. Heffron's suggestion and eventually Mr. Heffron applied for a refund of the difference.

62.     On or about August 3, 2014, Green Tree force-placed a hazard insurance policy on the Property and assessed Mr. Heffron's account the amount of $1,455.85 despite the fact that Mr. Heffron had a valid homeowner's insurance policy in place with Allstate.

63.     From April of 2013 through August of 2014, Green Tree representatives continued to place harassing telephone calls to Mr. Heffron, up to ten times each day, demanding that he pay money he stated he did not owe.  Each time he spoke to Green Tree, Mr. Heffron explained that he did not owe the sums demanded.

*The Unsolicited Green Tree Loan Modification*

64.     On or about June 13, 2013 Green Tree sent Mr. Heffron a Streamlined Modification Trial Period Plan ("TPP") Notice, despite the facts that the GMAC Modification was still in place, that Mr. Heffron was still fully compliant with the terms and conditions of same, and that he never applied for a new modification of his mortgage.  Again, this document was sent to Mr. Heffron care of his former counsel.  Mr. Heffron did not receive this letter until later.  TPP Notice attached hereto and made a part hereof as Exhibit D.

65.     The TPP Notice stated that Mr. Heffron would be eligible for a mortgage modification if he made trial period plan payments in the amount of $759.10 on July 1, August 1, and September 1, 2013.

66.     Mr. Heffron had neither requested a loan modification nor had he complied with the express terms of this new TPP Notice.  During the entire TPP period, he continued to pay the $484.47 as called for by the GMAC Modification, which was still in force and effect.

67.     Nevertheless, on or about October 23, 2013, Green Tree sent Mr. Heffron, this time at the Property, a "Loan Modification Agreement" (the "Green Tree Modification") for his signature.  Under the terms of the Green Tree Modification, Mr. Heffron's monthly principal and

interest payment would be $485.02, *a mere fifty-five cents* more than his previous payment under the GMAC Modification, to begin on December 1, 2013.  Green Tree Modification attached hereto and made a part hereof as Exhibit E.

68.     Surprised by the sudden appearance of the Green Tree Modification, Mr. Heffron believed that it represented Green Tree's assent to his position—one that he had explained to Green Tree dozens of times—that he was personally responsible for real estate taxes and homeowner's insurance and that his monthly payment should only be for principal and interest.

69.     On or about November 3, 2013, Mr. Heffron signed the Green Tree Modification and returned it to Green Tree.  Shortly thereafter, Green Tree recorded the Green Tree Modification with the DuPage County Recorder of Deeds.

70.     Material to Mr. Heffron's decision to sign the Green Tree Modification were the following:

a.     Mr. Heffron believed he was and would remain personally responsible for paying his own real estate taxes and homeowner's insurance;

b.     Mr. Heffron believed that the Green Tree Modification represented a resolution of all of the escrow issues of which he had complained during the previous 10 months because the difference between the monthly payments called for under the GMAC Modification and the Green Tree Modification was *a mere fifty-five cents*; and

c.     To Mr. Heffron, the modification promised relief from the repeated and continuous telephone calls that Green Tree representatives placed to him up to ten times each day.

71.     Mr. Heffron began to make monthly payments of $485.02 as called for by the Green Tree Modification on or about November 16, 2013, hopeful that the days of Green Tree representatives' incessant telephone calls were behind him.

*Green Tree's Abusive Collection Attempts Continue Post-Modification*

72.     Despite the execution of the Green Tree Modification, Green Tree representatives continued repeatedly and continuously, as described above, to demand payment of amounts far in excess of the $485.02 called for by the Green Tree Modification.

73.     The Green Tree Representatives explained to Mr. Heffron that he had to pay more than $485.02 because he had to pay escrow amounts for insurance, taxes, etc.

74.     Extremely frustrated and confused, Mr. Heffron explained to Green Tree representatives by telephone, letter, and fax, that he paid what was owed and would not pay more (thus disputed the debt, and refusing to pay it).  Mr. Heffron also stated that he was not required to pay additional amounts for real estate taxes and homeowner's insurance and that Green Tree had just sent him a modification agreement to that effect.

75.     Green Tree made false and misleading statements as to why Mr. Heffron had to pay real estate taxes and homeowners' insurance items, including, but not limited to, the following:

a.     That Mr. Heffron had been late in paying his homeowners' insurance premiums;

b.     That Mr. Heffron had missed monthly payments;

c.     That Mr. Heffron was participating in a Trial Period Plan pursuant to HAMP; and

d.     That Mr. Heffron's mortgage had been modified pursuant to HAMP.

76.     On or about August 19, 2013, Green Tree sent Mr. Heffron a letter stating that his request to cancel his escrow account was being denied on the following two bases: "Insurance and/or tax payments have not been paid timely; delinquent billings have occurred; insurance has been cancelled or non-renewed in the past," and "Account has had one or more late payments over the life of the account."  Letter of August 19, 2013 attached hereto and made a part hereof as Exhibit F.

77.     On or about March 26, 2014, Green Tree sent Mr. Heffron a letter stating, in relevant part:

> Records indicate your modified monthly home payment amount is $485.02. However, according to the enclosed Streamlined Modification Trial Period Plan Notice, the servicer is required to set aside a portion of the new monthly payment in an escrow account for payment of the taxes, insurance premiums and other required fees. The account may have previously provided for escrow; however, if not, a previous waiver of escrows is cancelled under the trial period plan.

Letter of March 26, 2014 attached hereto and made a part hereof as Exhibit G.

78.     Mr. Heffron was confused by the language of the March 26, 2014 letter because, without limitation:

   a.     He had not requested a loan modification, having just signed a new one in November of the previous year;

   b.     The letter stated that Green Tree would "set aside *a portion of the new monthly payment* in an escrow account for payment of the taxes, insurance premiums and other required fees," (emphasis added) but Green Tree representatives contemporaneously stated that he owed escrow amounts *in addition* to his monthly payment.

     c.     Mr. Heffron was further confused by the March 26 letter's apparent contradiction of the language of the August 26, 2013 letter in which Green Tree stated that "we are not collecting any funds to pay your taxes and insurance." Exhibit C.

79.     Again, on or about April 24, 2014, Green Tree sent Mr. Heffron a letter that explained why he was required to pay escrow, stating in relevant part:

> According to the Loan Modification Agreement *through HAMP*, the Taxes and Insurance are required to be escrowed. As of the date of this letter, your account is due for the March 1, 2014 payment in the amount of $772.03.

Letter of April 25, 2014 attached hereto and made a part hereof as Exhibit H (emphasis added).

80.     Mr. Heffron never had a loan modification through HAMP and was never eligible for such a modification because, without limitation:

     a.     He had no income during the relevant period; and

     b.     He had made no trial period payments.

81.     Throughout his dealings with Green Tree and continuing to the present time, Mr. Heffron was confused and misled by the differences between the monthly "informational statements" that Green Tree sent him and the statements made by Green Tree representatives over the telephone. None of the statements ever stated an amount Mr. Heffron had to pay for escrow items, but simply demanded a bottom line sum due. *See, e.g.*, Monthly Informational Statements attached hereto and made a part hereof as Group Exhibit I.

82.     Mr. Heffron was confused and upset by the above-described instances of Green Tree representatives telling him one thing during their myriad telephone calls while its correspondence and documents told him something else.

83.     Green Tree falsely stated that Mr. Heffron had failed to pay property taxes or homeowner's insurance premiums.

84. Green Tree falsely stated that Mr. Heffron's mortgage had been modified pursuant to HAMP, a program sponsored and underwritten by the United States government; *see* 15 U.S.C. §1692e(9).

85. Green Tree falsely stated that Mr. Heffron was required to pay escrow amounts because his mortgage had been modified pursuant to HAMP.

86. Green Tree verbally abused and intimidated Mr. Heffron and demanded they he had to speak with them.

### FIRST CLAIM FOR RELIEF
Violations of the Fair Debt Collection Practices Act ("FDCPA")
15 U.S.C. 1692 *et seq.*

87. Mr. Heffron restates and realleges the above paragraphs as though fully set forth herein.

88. Mr. Heffron is a "consumer," as defined by the FDCPA, 15 U.S.C. §1692a(3).

89. Green Tree is a "debt collector" as defined by §1692a(6) of the FDCPA, because it regularly uses the mails and/or the telephone to collect, or attempt to collect, delinquent consumer accounts.

90. Upon information and belief, Green Tree treated the lien on the Property as if it were in default when it acquired rights to the lien.

91. Defendant's acts and omissions violated 15 U.S.C. §1692 et seq., including, but not limited to: 1692d, 1692e, 1692e(2), 1692e(5), 1692e(9), 1692e(10), 1692f, 1692f(1).

92. As a direct result of Green Tree's violations of the FDCPA, Mr. Heffron suffered the damages alleged above.

93. Mr. Heffron is entitled to actual and statutory damages, reasonable attorney's fees and costs.

16

WHEREFORE, Plaintiff, THOMAS E. HEFFRON, prays this Honorable Court grant him the following relief:

A.    Declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

B.    Awarding Mr. Heffron statutory damages of $1,000 as prescribed by the FDCPA;

C.    Awarding Mr. Heffron actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

D.    Awarding Mr. Heffron costs and reasonable attorney fees as provided by 15 U.S.C. §1692; and

E.    Award such other and additional relief and this Court deems equitable and just.

## SECOND CLAIM FOR RELIEF
Violations of the Illinois Consumer Fraud and Unfair Business Practices Act ("ICFA")
815 ILCS 505/2

94.    Mr. Heffron restates and realleges the above paragraphs as though fully set forth herein.

95.    ICFA is a regulatory and remedial statute intended to protect consumers, borrowers, and businessman against fraud, unfair methods of competition, and other unfair and deceptive business practices.

96.    Mr. Heffron is a "consumer" as defined by the ICFA in 815 ILCS 505/1.

97.    Green Tree's conduct with respect to Mr. Heffron occurred in the course of trade or commerce.

98.     As set forth above, Green Tree's conduct and pattern of practice with respect to Mr. Heffron, engaging in unfair and deceptive acts, and by using fraud, deception, and misrepresentation in its attempts to collect a debt from him, violated the ICFA, 815 ILCS 505/2.

*Deception and Misrepresentation*

99.     The ICFA prohibits false, deceptive, misleading and unfair acts or practices, "including but not limited to the use or employment of any deception, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2.

100.    Green Tree engaged in false, deceptive, and misleading activity with respect to its servicing of Mr. Heffron's mortgage, without limitation, as follows:

a.      In its letter of August 19, 2013, Exhibit F, Green Tree informed Mr. Heffron that he was required to pay escrow sums in addition to his monthly principal and interest because his homeowner's insurance was not current. This was not true as Mr. Heffron had kept his homeowner's insurance up to date during his entire interaction with Green Tree. On numerous occasions, Mr. Heffron advised Green Tree, orally and by providing relevant documentation, of the adequacy of his homeowner's insurance and its status as paid, but these representations were totally ignored by Green Tree.

b.      In its letter of August 26, 2013, Exhibit C, Green Tree, told Mr. Heffron that his "monthly payment amount [was] $484.47" and that it was "not collecting any funds to pay your taxes and insurance." This was false because Green Tree's agents were contemporaneously demanding sums in excess of $484.47 each month because of alleged escrow account deficiencies.

c.     In its letter of April 25, 2014, Exhibit H, Green Tree informed Mr. Heffron that "[a]ccording to the Loan Modification Agreement through HAMP, the Taxes and Insurance are required to be escrowed." This statement was false as Mr. Heffron had never received a loan modification through HAMP and furthermore, upon information and belief, was not even eligible for one during the relevant period of time.

d.     Each month, Green Tree would send Mr. Heffron an "informational statement" that purported to indicate how much he was expected to pay. These statements were misleading inasmuch as they confusingly indicated that vastly different amounts were due each month with no explanation. *See* Group Exhibit I.

101.   Green Tree intended that Mr. Heffron rely on its deceptive representations because it stood to profit from receipt of amounts above and beyond what the GMAC Modification and the Green Tree Modification called for.

*Unfair Practices*

102.   The ICFA provides redress not only for deceptive business practices but also for practices that are unfair. A business practice is unfair if it offends public policy, or if it is immoral, unethical, oppressive or unscrupulous and if it causes substantial injury to consumers.

103.   As described in the paragraphs above, including but not limited to its pattern of telephone harassment, Green Tree's conduct amounts to an unfair business practice with respect to Mr. Heffron.

104.   In addition to the damages alleged above, Mr. Heffron suffered the following economic harm, including, without limitation:

a.     Medical bills as a result of his hospitalization and ongoing treatment;

      b.      Out of pocket fees for medications prescribed to him as a result of the stress induced by Green Tree's conduct; and

      c.      Other ordinary and necessary expenses (postage, etc.) incurred during his course of communication with Green Tree.

WHEREFORE, Plaintiff, THOMAS E. HEFFRON, prays this Honorable Court grant him the following relief:

      A.      Enter judgment in his favor and against Green Tree;

      B.      Declare that the practices complained of herein are unlawful and violate the ICFA;

      C.      Award Mr. Heffron statutory, actual, and punitive damages in an amount to be determined at trial, for the underlying ICFA violations;

      D.      Award Mr. Heffron costs and reasonable attorneys' fees under 815 ILCS 505/10a(c); and

      E.      Award such other and additional relief and this Court deems equitable and just.

### THIRD CLAIM FOR RELIEF
Negligent Infliction of Emotional Distress

105.    Mr. Heffron restates and realleges the above paragraphs as though fully set forth herein.

106.    Green Tree had a duty to treat Mr. Heffron is a civilized and reasonable fashion during its attempts to collect money from him. *See, e.g.*, 15 U.S.C. § 1692d(5) (FDCPA section prohibiting harassment and other offensive collection tactics).

107.     Green Tree breached its duty to Mr. Heffron, without limitation, as follows:

a.     Placing eight to ten telephone calls each day, seven days a week, to Mr. Heffron during which Green Tree representatives demanded money not due from him;

b.     Repeatedly ignoring correspondence from Mr. Heffron in which he attempted to explain his position and rectify any misunderstandings between himself and Green Tree;

c.     Making unnecessarily duplicative document requests concerning Mr. Heffron's payment of real estate tax and insurance items.

108.     As a direct and proximate result of Green Tree's breach of its duty to treat him appropriately, Mr. Heffron suffered damages as described above.

109.     Defendants acted with oppression, fraud, and/or malice, and in the conscious disregard of Mr. Heffron's rights, thereby entitling Mr. Heffron to punitive damages in an amount according to proof and a finder of fact at trial.

WHEREFORE, Plaintiff, THOMAS E. HEFFRON, prays this Honorable Court grant him the following relief:

A.     Actual damages, commensurate with the outrageous quality of the defendant's conduct, in an amount to be determined at trial;

B.     Such other and additional relief as equity and justice shall require.

**FOURTH CLAIM FOR RELIEF**
Invasion of Privacy (Intrusion upon Seclusion)

110.     Mr. Heffron repeats and realleges the above paragraphs as though fully set forth herein.

111.     Green Tree's outrageous, abusive, and undignified acts as described herein constitute an unauthorized intrusion upon Mr. Heffron's seclusion.

112.    The intrusion would be highly offensive or objectionable to a reasonable person.

113.    The matter intruded on was private.

114.    The intrusion caused Mr. Heffron anguish and suffering.

115.    As a direct and proximate result of Green Tree's unlawful conduct, Mr. Heffron has suffered damages in an amount to be determined by proof and a finder of fact at trial.

116.    Green Tree acted with oppression, fraud, and/or malice, and in the conscious disregard of Mr. Heffron's rights, thereby entitling Mr. Heffron to punitive damages in an amount according to proof and a finder of fact at trial.

WHEREFORE, Plaintiff, THOMAS E. HEFFRON, prays this Honorable Court grant him the following relief:

A.    Actual damages;

B.    Punitive damages;

C.    Attorney's fees and costs; and

D.    Such further and additional relief as equity and justice shall require.


DATED:        January 30, 2015            Respectfully submitted,

                                By:    /s/ Roger Zamparo, Jr.
                                       Roger Zamparo, Jr. (ARDC #3123737)
                                       ZAMPARO LAW GROUP, P.C.
                                       1600 Golf Road, Suite 1200
                                       Rolling Meadows, IL 60008-4229
                                       (224) 875-3202 (t)
                                       (312) 276-4950 (f)
                                       roger@zamparolaw.com

## __EXHIBIT LIST__

Exhibit A – GMAC Non-HAMP Loan Modification Agreement

Exhibit B – GMAC Modification Cover Letter

Exhibit C – Letter of August 26, 2013

Exhibit D – TPP Notice

Exhibit E – Green Tree Modification

Exhibit F – Letter of August 19, 2013

Exhibit G – Letter of March 26, 2014

Exhibit H – Letter of April 25, 2014

Exhibit I – Monthly Informational Statements